# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

MICHELLE B.[1],

                                Plaintiff,

       v.                                    3:18-CV-171 (ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                Defendant.

PETER A. GORTON, ESQ., for Plaintiff
MICHELLE L. CHRIST, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## MEMORANDUM-DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. ).

## I.  PROCEDURAL HISTORY

Plaintiff protectively filed[2] an application for Disability Income Benefits ("DIB")

---

[1] In accordance with recent guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in June 2018 in order to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify the plaintiff using only her first name and last initial.

[2] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. §§ 404.630, 416.340.  There are various requirements for this written statement. *Id.*  If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a later date.

on September 7, 2014,[3] alleging disability beginning July 1, 2012, based upon carpal tunnel and chronic wrist pain. (Administrative Transcript ("T") 135-36, 168). The application was denied initially on December 18, 2014. (T. 66-69). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held by video on February 12, 2017 before Administrative Law Judge ("ALJ") Gretchen Mary Greisler. (T. 31-59). At the hearing, the ALJ heard testimony from plaintiff and Vocational Expert ("VE") Josiah Pearson. (*Id.*) On April 4, 2016, ALJ Greisler found plaintiff was not disabled, through March 31, 2014, the date that she was last insured. (T. 15-23). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on December 12, 2017. (T. 1-6).

## II.    GENERALLY APPLICABLE LAW

### A.    Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of

---

[3] The documents in the record seem to indicate that plaintiff protectively applied for benefits on September 8, 2014. (*See* T. 135) ("On September 8, 2014, we talked to you and completed your application for SOCIAL SECURITY BENEFITS.")  If there is an error in the date, the one day difference is not relevant to the court's decision.

2

substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.  The plaintiff has the burden of establishing disability at the first four steps.  However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step.  *Id.*

**B.    Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision.  *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin,*

3

*Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III. **FACTS**

Plaintiff was 34 years old at the time of the ALJ's hearing. (T. 36). She lives at home with her husband and two children, ages 12 and 15. (T. 37). Plaintiff is right-handed. (T. 37). She has a driver's licence, but does not drive regularly. (*Id.*) Plaintiff testified that driving is very difficult for her because it is hard for her to turn the wheel, and therefore, she does not "do parking ramps." (T. 38). Plaintiff relies on her mother to "get around town," and she gets out of the house "a couple" of times per week to go to the grocery store or to Walmart. (T. 37-38).

Plaintiff graduated from high school, taking "regular" classes. (T. 38). She attempted to go to "hair school," but could not complete the program because of her wrists. (*Id.*) Although plaintiff worked as a home health aide for a short time,[4] the majority of her past relevant work was at Walmart. (T. 39). At Walmart, she started doing "overnight stocking." (*Id.*) She was moved to cashier, but her wrist pain was so bad that she was moved to "a greeter" position. (*Id.*) However, plaintiff testified that "they" were not able to keep her as a greeter,[5] so she was moved to cashier again, but she could not do the cashier work because it required lifting heavy items. She stated "that's why I left that job." (*Id.*)

Plaintiff testified that she has chronic pain at the top of both of her wrists, and

---

[4] Plaintiff testified that she worked as a home health aide for less than one year, she only worked part-time, and she quit because of the pain in her wrists. (T. 39).

[5] Plaintiff's testimony is not clear on this issue. Plaintiff specifically stated that she "couldn't" be a cashier because of the heavy lifting requirement. (T. 39). However, when she was talking about the greeter position, she stated that Walmart was not "able" to keep her in that job. (*Id.*) It appears that she did not leave the greeter position because she was unable to do it, but rather that there was some other reason that Walmart could not keep her as a greeter. (*Id.*)

that she has "lumps" where the wrists swell. (T. 40). She has pain opening a door, carrying her purse, or even holding her phone to her ear for an extended period of time. (T. 40-41). Plaintiff stated that if she has to write a letter, she can only write half of a page before she has to take a break and start writing again. (T. 41). She often wears pants with an elastic waist because she has trouble buttoning, and she testified that she has not worn sneakers in a long time. (T. 42).

Plaintiff's husband usually cuts her food. Plaintiff tries to eat, holding the utensil in her right hand, but the pain forces her to use her left hand, and "sometimes" she eats with her fingers because the pain is so severe. (*Id.*) Plaintiff uses a straw to drink her coffee so she does not have to lift the cup. (*Id.*) Plaintiff testified that she would have a lot of difficulty lifting something repetitively, even if it was "really light," and she could not lift half a gallon of milk at all. (T. 43-44).

Plaintiff stated that she had a total of six surgeries on her wrists, the last of which took place several months prior to the hearing. (T. 44). Plaintiff testified that the surgeries did not make her wrists better, the "lump" came back, and the pain was "exactly the same." (T. 44-45). Plaintiff testified that she has pain all the time, and that she wakes up with pain in her wrists. (T. 47). Her sleep is often interrupted by the pain. (T. 48). Plaintiff stated that she occasionally takes Vicodin for the pain, but that it makes her sleepy,[6] and that heat has been the best treatment for her wrists. (T. 45). Plaintiff stated that she puts heat on her wrists several[7] times per day for approximately

---

[6] Plaintiff stated that she did not take the Vicodin often, in part, because she "had kids." (T. 45).

[7] Plaintiff stated that "several" was usually more than five times per day, but that "on a good day," she would only need to apply the heat two or three times. (T. 47).

20-25 minutes each time.[8] She stated that for the 20-25 minutes that she was using the heated bean bag, she could not use her hands. (T. 46). Plaintiff also testified that she must lie down in the afternoon. (T. 48). Plaintiff stated that her children are her "support." They help her cook, carry and fold the laundry, vacuum, and do dishes. (T. 48). Plaintiff stated that she never carries anything, and that despite all the surgeries, her wrists were no better than they were before. (T. 49).

The ALJ then took the VE's testimony. (T. 50-59). The ALJ asked the VE about the physical requirements of plaintiff's past relevant work and then asked him three hypothetical questions. (T. 51-52, 52-55). The first two questions assumed that plaintiff could perform light work, with restrictions on the use of her wrists. (T. 51-54). The third question asked the VE to assume that plaintiff could perform only sedentary work in addition to the upper extremity limitations. (T. 52-55) The third hypothetical also asked the VE to assume that plaintiff could only lift five pounds "occasionally," and could not engage in repetitive hand movements. (T. 52, 55). Plaintiff could never climb ladders, ropes, or scaffolds, could only occasionally handle, finger, and feel with the right dominant upper extremity, and could frequently handle, finger, and feel with the left side. (T. 52).

In response to the third hypothetical question, the VE testified that plaintiff could still perform work as a greeter or "information clerk." (T. 55). The VE also testified that although there would be "some erosion . . . around 25%" in the overall number of

---

[8] Plaintiff testified that the heat was applied by wrapping something "like a bean bag" that you put in the microwave around her wrists. (T. 45-46). She also stated that she was only supposed to apply heat for 10-15 minutes, but that she "milk[ed] it" and left the heat on her wrists for 20-25. (T. 45).

jobs, plaintiff could also perform alternative work as a call-out operator and a telephone solicitor.[9]  The information clerk job technically did not require any fingering at all, but the VE noted that fingering might still be considered "occasional." (T. 56).  The telephone solicitor job had reaching and handling at the "occasional level, and fingering at the frequent level, but was still appropriate for plaintiff because of the "bimanual use of the fingers." (T. 56-57).  Plaintiff's counsel asked whether there would be any lifting involved in these jobs, and the VE testified that "occasionally" there might be lifting up to the sedentary level, but that the VE had already taken that into consideration in determining that plaintiff could do alternative work. (T. 57).  The VE stated that was "why I eroded the numbers overall." (T. 57).

The ALJ's decision and the plaintiff's briefs provide a detailed statement of the medical and other evidence of record. (T. 17-22, Pl.'s Br. at 1-9).  Rather than reciting this evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff and with any modifications noted in my decision.

## IV.    THE ALJ'S DECISION

The ALJ first found that plaintiff met her insured status until March 31, 2014. (T. 17).  Plaintiff had not engaged in substantial gainful activity from July 1, 2012, her alleged date of onset until March 31, 2014. (*Id.*)  At step two of the sequential evaluation, the ALJ found that plaintiff's Carpal Tunnel Syndrome ("CTS") and Cubital Tunnel Syndrome ("Cubital Tunnel") were severe. (T. 17).  At step three of the

---

[9] The jobs would be available even if plaintiff could not tolerate any vibration at all in her upper extremities. (T. 55-56).

8

evaluation, the ALJ found that plaintiff's severe impairments did not meet or medically equal the severity of any Listed Impairments. (T. 18). In making this determination, the ALJ considered Listing 11.14 (Peripheral Neuropathy). (*Id.*) The ALJ found that plaintiff did not have marked or extreme limitations with regard to the use of her extremities as required by the Listing.[10] (*Id.*)

At step four, the ALJ found that plaintiff could perform the physical requirements of sedentary work, with several limitations to the use of her upper extremities. (T. 18-21). Plaintiff could occasionally lift up to five pounds, and she could never climb ladders, ropes, or scaffolds. (T. 18). She could *occasionally* handle, finger, and feel with her right dominant extremity; and she could *frequently* handle, finger and feel with her left non-dominant extremity. Plaintiff could not engage in repetitive hand movements, but could occasionally tolerate exposure to vibration. (*Id.*)

The ALJ reviewed plaintiff's testimony and the medical evidence, acknowledging that plaintiff has had six surgeries on her wrists. (T. 19). The ALJ found that plaintiff's medical impairments could reasonably be expected to cause her alleged symptoms, including pain, but that the plaintiff's statements as to the intensity and the limiting effects of those symptoms were not "entirely consistent with the medical and other evidence of record." (T. 19). The ALJ considered the plaintiff's statements regarding her daily activities as well as the medical findings. (T. 19-21).

The ALJ discussed both positive and negative test results, but noted that, as late as December 2015, plaintiff's physical examinations showed that she had intact hand

---

[10] There is no dispute that plaintiff does not meet the requirements of a Listed Impairment.

and finger dexterity, 4/5 grip strength, and she demonstrated the ability to zip, button and tie. (T. 19-20). The ALJ stated that in April of 2013, despite positive Tinel's[11] sign bilaterally and dorsal wrist pain, plaintiff had good flexibility in her fingers. (T. 20).

The ALJ also reviewed the physicians' reports, including those of plaintiff's treating physician, Dr. David Ellison and of consulting examiner Gilbert Jenouri. (T. 20-21). The ALJ only gave partial weight to Dr. Jenouri's report and rejected the report to the extent that he found that plaintiff had some limitation for sitting, standing, walking, foot control, or postural limitations. (T. 20). The ALJ found that neither Dr. Jenouri, nor any of the other physicians diagnosed any impairments which would form a basis for such limitations. (T. 20). The ALJ based her finding on Dr. Ellison's statement that plaintiff's wrist impairments would have no effect on the plaintiff's ability to sit, stand, or walk. (T. 20).

The ALJ also found that plaintiff's lifting and/or carrying limitations were greater than those expressed by Dr. Jenouri. (T. 20). The ALJ accepted Dr. Ellison's finding that plaintiff could occasionally lift only up to five pounds, could use her right arm and hand up to 1/3 of each working day, and could use her left arm and hand more than 1/3 of the working day. (T. 20). The only opinion of Dr. Ellison's that the ALJ did not accept was his answer to questions on a form, regarding plaintiff's ability to be "on task" and his estimation of her necessity to miss work each month. (T. 20). The ALJ

---

[11] "Tinel's sign" is a test used to determine whether a nerve is irritated. https://www. medicinenet.com/script/main/art.asp?articlekey 16687. Tinel's sign is "positive" when light tapping over the nerve results in a tingling, or feeling "pins and needles," in the distribution of the nerve. In carpal tunnel syndrome, where the median nerve is compressed at the wrist, Tinel's sign is often positive, which results in tingling in the thumb, index, and middle fingers.

stated that Dr. Ellison's opinions about plaintiff's physical capabilities were "consistent with the longitudinal record," but that "his estimations regarding the time off task and [days] absent from work are speculative at best and I therefore reject same." (T. 20).

Based on the plaintiff's RFC and the VE's testimony, the ALJ found at step four that plaintiff could perform her past relevant work as a greeter or "information clerk" at Walmart. (T. 21). In the alternative, the ALJ considered step five of the sequential evaluation, finding that plaintiff could perform other jobs which exist in the national economy. (T. 21). In making this determination, the ALJ considered the Medical Vocational Guidelines as a framework for her decision. 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201.28. (T. 22). However, because plaintiff has additional limitations that would "impede" plaintiff's ability to perform all or substantially all of the requirements of sedentary work, the ALJ considered the VE's testimony regarding jobs that plaintiff could still perform, notwithstanding these additional limitations. (T. 22). The VE found that plaintiff could still perform the jobs of telephone solicitor and call-out operator. (T. 22). Thus, the ALJ determined that plaintiff was not disabled from July 1, 2012 until her insured status expired on March 31, 2014. (T. 22-23).

## V.     ISSUES IN CONTENTION

Plaintiff raises the following arguments:

1. The ALJ substituted her own opinion for that of the undisputed medical opinion and violated the treating physician rule. (Pl.'s Br. at 9-16) (Dkt. No. 9).

2. Plaintiff cannot perform her past relevant work or any other work in the national economy. (Pl.'s Br. at 16).

3. The ALJ used an "erroneous" hypothetical question. (Pl.'s Br. at 16).

Defendant argues that the Commissioner's determination was supported by substantial evidence and should be affirmed. (Def.'s Br. at 7-15) (Dkt. No. 11). Plaintiff filed a reply brief, focusing on the argument that she could not meet the work pace and attendance requirements of her former work or any other work in the national economy. (Dkt. No. 14). For the following reasons, this court agrees with defendant and will affirm the Commissioner's decision, dismissing the complaint.

## DISCUSSION

## VI. RFC EVALUATION/TREATING PHYSICIAN

### A. Legal Standards

#### 1. RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis . . . ." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must

specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

### 2.      Treating Physician

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . ." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The ALJ must properly analyze the reasons that a report of a treating physician is rejected. *Halloran*, 362 F.3d at 32-33. An ALJ may not arbitrarily substitute her own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### B.      Application

Plaintiff's counsel reviews a great deal of the medical evidence of record in his brief and argues that the ALJ engaged in picking and choosing only the medical

evidence that favored the ALJ's determination.  The essence of plaintiff's argument is that the ALJ should have accepted Dr. Ellison's opinion that plaintiff would be "off task" for 33% of the work day, and that she would be absent from work due to her impairments for four days per month.[12]  These opinions were expressed in a Questionnaire, dated January 12, 2017. (T. 322-24).  The ALJ rejected these opinions as "speculative," while accepting Dr. Ellison's medical examination findings and his findings regarding plaintiff's exertional capabilities.  The January 2017 Questionnaire states that plaintiff can lift up to five pounds "occasionally," or up to 1/3 of the day. (T. 324).

In fact, the ALJ's RFC is taken from part of Dr. Ellison's January 2017 Questionnaire, in which he finds that none of plaintiff's other physical capabilities would be impacted by her wrist impairments, together with a Supplemental Questionnaire[13] which he signed on February 27, 2017, in which he estimates plaintiff's ability to handle, finger, feel, and manipulate with each one of her extremities.[14] (T. 322-24, 368).  The ALJ rejected Dr. Jenouri's opinion based upon the treating physician's finding regarding plaintiff's physical abilities.  Thus, the ALJ complied

---

[12] As stated above, plaintiff focused her reply brief on this argument.

[13] The Supplemental Questionnaire is a check box form, indicating that plaintiff could use her right arm and hand up to 1/3 of the workday and her left arm and hand more than 1/3 of the workday. (T. 368).  A copy of the January 2017 Questionnaire is attached to the February 2017 Supplemental Questionnaire. (T. 369-71).

[14] One question on the form asked how often plaintiff would have to alternate between sitting and standing "if" the plaintiff were required to alternate sitting and standing. (T. 323).  Dr. Ellison stated that this was "not impacted," but stated that plaintiff would require rest periods frequently. (*Id.*) There is no indication that a "sit/stand" requirement is necessary in plaintiff's case, and this answer is not consistent with Dr. Ellison's other answers in the same paragraph that sitting, standing, and walking were not impacted at all, with no qualifications added to the answer.

with the treating physician rule in that respect.

There is no question that plaintiff has severe wrist impairments, and she states that the six surgeries have not improved her condition.[15]  However, her impairments, her pain, and her lack of improvement after surgery were taken into account when the ALJ's RFC and corresponding hypothetical question to the VE limited plaintiff to lifting less than five pounds, using her right hand and arm "occasionally," and restricted her from any repetitive movements.

The ALJ's decision is not required to perfectly correspond with any of the opinions of medical sources cited in her decision, and she may accept portions of the medical records while rejecting others in order to make an RFC determination that is "consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013),

The Second Circuit has recently made it clear that the ALJ need not afford controlling weight to the opinions of a plaintiff's treating physicians when they are not supported by clinical findings and inconsistent with their own records and treatment notes. *Smith v. Berryhill*, 740 F. App'x 721, 724 (2d Cir. 2018).  The ALJ must give

---

[15] Plaintiff did report doing well after her left wrist surgery in 2012. (T. 290).  Dr. Ellison stated that plaintiff felt that she had complete relief of the numbness in her left hand, she had excellent range of motion of her fingers, and normal sensation, notwithstanding the positive Tinel's and Phalen's tests. (*Id.*)  Plaintiff denied any numbness in 2015. (T. 245).  She also denied decreased mobility, swelling and tingling in her arms. (T. 245).  In 2015, she denied numbness in her hands, although she stated that she had difficulty opening jars. (T. 325).  During an examination dated December 28, 2015, while acknowledging that plaintiff reported wrist pain, Dr. Taseer Minhas found 5/5 power in both upper and lower extremities, intact sensation, symmetric reflexes, and normal neurological examination. (T. 326).  She had some tenderness in the dorsum of her right wrist and complained of some neck pain.  Dr. Minhas referred plaintiff for x-rays and a nerve conduction study. (T. 326).  The electrodiagnostic study was normal. (T. 328).

"'good reasons'" for affording the limited weight. *Id.* (quoting *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998); 20 C.F.R. § 404.1527(c) (2)). In *Smith*, the ALJ gave less weight to the opinions of three treating physicians who completed questionnaires, in which they checked boxes, indicating that the plaintiff would be "off-task" various percentages of the day or absent from work for various days during the month. *Id.* The court also stated that the ALJ was not required to identify the evidence explicitly rebutting the opinions of Smith's treating physicians before discounting or rejecting them." *Id.* at 726 (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)).

In this case, this court finds that the ALJ's rejection of Dr. Ellison's "off task" and absenteeism opinions is supported by substantial evidence, including an analysis of Dr. Ellison's opinion of plaintiff's physical abilities. The questionnaire asks whether plaintiff's impairments, "and/or" any side effects from medication, would cause plaintiff pain or fatigue, affecting plaintiff's concentration, work pace, or need to rest at work. (T. 369). Dr. Ellison answered "yes" to all of the questions. (*Id.*) The next question states that if any of the answers to the previous question were "yes," the doctor should estimate the percentage of time that the individual would be "off task" as a result of any or all of the limitations in the previous question. (T. 370). Dr. Ellison checked the box indicating that plaintiff would be "off task" more than 33% of the day. (*Id.*)

Although Dr. Ellison states that plaintiff will be "off task" for more than "33%" of the workday, he states in his estimate of plaintiff's physical abilities, that plaintiff can use her right arm and hand for up to 1/3 of the workday and her left arm and hand

for more than 1/3 of the workday. (T. 368) (Supplemental Questionnaire). The term "off task" depends on what the individual perceives as the task. The ALJ's finding that such a determination is "speculative" is supported by the evidence of record. If Dr. Ellison found that plaintiff could use her right hand and arm for 1/3 of the workday, he may have believed plaintiff would be "off task" the rest of the day. This could be true if plaintiff's job required her to use her hands for the entire workday.

However, the ALJ took Dr. Ellison's stated physical limitations into account and determined that plaintiff could only perform work which required her to use her right arm and hand only "occasionally," or up to 1/3 of the workday in addition to limiting her lifting requirement to five pounds "occasionally." The ALJ also specifically found that plaintiff could not do repetitive movements, and thus, even if "pace" were affected, there is no indication that plaintiff would be unable to do her former work as a Walmart greeter. There were no pace requirements discussed in any of the jobs suggested by the VE. This supports the ALJ's finding that Dr. Ellison's opinions in this regard were speculative or not relevant to the particular jobs that were available to plaintiff, given her limitations. There is no indication that Dr. Ellison knew or considered the type of work that was available, notwithstanding plaintiff's limitations.

Plaintiff argues that the ALJ engaged in "picking and choosing" only the evidence that was favorable to the Commissioner. However, the ALJ acknowledged that plaintiff had both positive and negative findings and based her RFC determination on the limitations imposed by plaintiff's treating physician.[16] Plaintiff has had both

---

[16] The ALJ stated that "[a]lthough the record includes some positive findings on exam, the record includes benign findings as well." (T. 19). The ALJ cites a normal EMG dated December 28,

17

positive and negative Tinel's and Phalen's[17] tests.  Arthrograms of plaintiff's wrists have shown normal results. (T. 252 (3/4/13 - left wrist); 259 (10/31/12 -right wrist); 261-62 (6/6/12 - left and right EMG); 253 (5/7/15 -right wrist)).

Plaintiff argues that the ALJ erred in relying on plaintiff's "activities." (Pl.'s Br. at 12-13).  However, the ALJ did ***not*** determine plaintiff's RFC relying solely on her daily activities.  The ALJ was discussing plaintiff's credibility regarding the intensity and persistence of her pain. (T. 19).  The ALJ stated that the evidence in the record showed that plaintiff was more active than she testified. (T. 19).  Plaintiff told Dr. Jenouri in 2015 that her activities included cooking, cleaning, laundry, shopping, childcare, and dressing *every day*. (T. 235) (emphasis added).  Plaintiff also told Dr. Jenouri that she watches TV, reads, "plays sports," and socializes with friends. (T. 235).  When considering a plaintiff's credibility, daily activities are listed first in the section of the regulations, governing the evaluation of the "intensity and persistence" of a plaintiff's symptoms. 20 C.F.R. § 404.1529(c)(3)(i).

Plaintiff argues that Dr. Jenouri's statement that plaintiff could zip, button, and tie was irrelevant because it was only a "snapshot" in time. (Pl.'s Br. at 12).  Plaintiff states that there is no indication that Dr. Jenouri tested plaintiff's functions "over time

_____

2015. (T. 19).  The test revealed no evidence of peripheral entrapment neuropathy, cervical radiculopathy, and brachial plexopathy. (T. 19) (citing T. 328).  Dr. Jenouri's examination showed that plaintiff's hand and finger dexterity were intact, grip strength was 4/5, and plaintiff was able to zip, button and tie. (T. 19) (citing T. 236).

[17] Phalen's Test is another test for CTS and is performed by having the patient hold the backs of his or her hands together.  A positive test results when numbness or tingling is felt along the nerve after a certain amount of time. https://www.ncbi.nlm.nih.gov/pubmed/1461811; https://www.healthline.com /health/tinels-sign#accuracy.

or after repeated use of her hands/wrists." (*Id.*)  However, the ALJ specifically found in her RFC that plaintiff could not engage in repetitive hands movements. (T. 18).  The ALJ also found that Dr. Jenouri overestimated some of plaintiff's abilities and rejected those findings.  Even if plaintiff was more restricted than she expressed to Dr. Jenouri, the activities that plaintiff admitted to performing on a daily basis are not inconsistent with the ability to perform the work that the ALJ found was available for her to perform. *See Cichocki v. Astrue*, 729 F.3d 172, 178 (2d Cir. 2013) (ALJ properly considered plaintiff's daily activity questionnaire, in which she stated that she performed numerous daily tasks that were consistent with a residual capacity to perform light work).

The court notes that on September 1, 2015, an examination of the plaintiff by a nurse practitioner showed that plaintiff had joint tenderness and weakness, but there was no edema, no color change, and she had full range of motion of her wrists with moderate increase in pain with rotation on the right. (T. 245-48).  Plaintiff had no motor deficits and her sensation was normal, although she had tenderness at the dorsal scar over her right wrist. (T. 247).  Plaintiff noted that her pain was 7/10. (T. 248).

As stated above, the ALJ acknowledged the diagnoses made by the physicians in this case, and accepted that plaintiff has pain in her wrists to the point where she cannot lift more than five pounds occasionally and cannot do repetitive movements with her hands.  However, the jobs that the VE proposed do not require plaintiff to perform any movements that are beyond her RFC as stated by her own treating physician.[18]

---

[18] On January 23, 2019, the Second Circuit decided *Lockwood v. Comm'r of Soc. Sec.*, No. 17-2591, __ F.3d __, 2019 WL 286674 (2d Cir. Jan. 23, 2019).  In *Lockwood*, the court held that the

Therefore, the ALJ's determination of plaintiff's RFC is supported by substantial

evidence. Where the hypothetical question is based on an ALJ's RFC analysis, which

is supported by substantial facts, the hypothetical is proper. *See Calabrese v. Astrue*,

358 F. App'x 274, 276-277 (2d Cir. 2009); *Dumas v. Schweiker*, 712 F.2d 1545, 1554

(2d Cir. 1983) (there must be substantial evidence to support the assumption upon

which the VE bases his or her opinion). *See also Daniels v. Colvin*, No. 1:14-CV-994,

2017 WL 1313838, at *2 (W.D.N.Y. Apr. 8, 2017) (where RFC is supported by

---

Commissioner must obtain a "reasonable explanation" for an apparent conflict between the VE's testimony and the Dictionary of Occupational Titles ("DOT"). 2019 WL 286674 at *4-6. In *Lockwood*, the relevant finding was that the plaintiff could not reach overhead, but the VE cited available jobs that would require "reaching." The court found that the Commissioner erred in failing to reconcile the VE's testimony that a person with an overhead reaching limitation could perform three jobs that the DOT states all required "reaching." *Id.* at *6. The district court had "inferred" that the VE's personal experience led her to conclude that the named jobs did not entail overhead reaching, but the Second Circuit "declined to follow" that inference. *Id.* at *5 n.4. The court stated that "[w]hile [the VE's] observations may well explain the apparent discrepancy between her testimony and the [DOT], the fact remains that it is the Commissioner's responsibility "'to obtain a reasonable'" explanation for any such discrepancy, and not this court's obligation to concoct one *post hoc.*" *Id.* This court notes that in *Lockwood*, the district court had also discussed a lifting restriction that was more than required by the plaintiff's RFC for "light" work. *See Lockwood v. Comm'r of Soc. Sec.*, No. 6:16-CV-648, 2017 WL 2656194, at *5 (N.D.N.Y. June 20, 2017), *rev'd and remanded*, No. 17-2591, *supra*. The Second Circuit did not reverse the district court's finding on the lifting issue, even though plaintiff in *Lockwood* could not lift the 20 pounds required for light work.

I find that *Lockwood* does not affect my decision in this action. The ALJ, plaintiff's attorney, and the VE discussed plaintiff's five pound lifting restriction during the hearing. (T. 57-58). The VE specifically stated that the DOT defines sedentary work as lifting "up to ten pounds," which "digresses from the DOT, so I am using my experience to answer that." (T. 58). The VE also testified that she had already "erode[d]" the number of sedentary jobs based on the plaintiff's actual limitation. (T. 57). Thus, any discrepancy between the VE's testimony and the DOT was reasonably explained at the hearing, even though in her decision, the ALJ stated that she determined that "the [VE's] testimony is consistent with the information contained in the DOT and its companion publications." (T. 22). To the extent that the ALJ's statement could be considered error because there was a conflict which was resolved, the error is harmless because of the detailed discussion at the hearing. As the district judge noted in *Lockwood*, the exertional categories require that an individual must not be required to lift over a certain amount, but some jobs in the particular exertional category would not require lifting the maximum amount of weight. 2017 WL 2656194 at *5. As stated above, the Second Circuit did not reverse this finding.

substantial evidence, the hypothetical was supported by substantial evidence, and the jobs cited by the VE were not inconsistent with the RFC, the ALJ was entitled to rely on the VE's testimony) (citing *Pardee v. Astrue*, 631 F. Supp. 2d 200, 212 (N.D.N.Y. 2009).

      **WHEREFORE**, based on the findings above, it is

      **ORDERED**, that the Commissioner's decision is **AFFIRMED**, and the complaint is **DISMISSED**, and it is further

      **ORDERED**, that the Clerk enter judgment for the **DEFENDANT**.

Dated: February 6, 2019

Hon. Andrew T. Baxter
U.S. Magistrate Judge